IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THAT FOOT DOCTOR, LLC,<br><br>Plaintiff,<br>v.<br><br>ROBERT F. KENNEDY, JR., SECRETARY OF HEALTH AND HUMAN SERVICES, in his official capacity,<br><br>Defendant. | CIVIL ACTION NO. 26-7474<br><br>**COMPLAINT IN CIVIL ACTION** |

Plaintiff That Foot Doctor, LLC ("Plaintiff"), by and through its counsel of record, Hill Fenstermaker LLC, against Defendant Robert F. Kennedy, Jr., Secretary of Health and Human Services, in his official capacity, alleges as follows:

## NATURE OF THIS ACTION

1. This is an action for judicial review of a final decision by Administrative Law Judge ("ALJ") Wendy A. Weber dated May 21, 2025 ("Decision"), Office of Medicare Hearings and Appeal Number 3-14706151359. The Decision is attached hereto as **Exhibit "A."**

2. Plaintiff timely appealed the Decision to the Medicare Appeals Council ("Council") on July 17, 2025, Docket Number M-25-3364.

3. Pursuant to 42 C.F.R. § 405.1100(c), the Council was to issue a decision, dismissal or remand order within ninety (90) days after the appeal, but the Council did not issue any decision within the statutory timeframe.

4. On August 6, 2026, Plaintiff submitted a request to the Council to escalate the appeal to Federal district court pursuant to 42 C.F.R. § 405.1132(a)(2).

5. On August 20, 2026, the Council granted Plaintiff's request for escalation. The Notice and Order of Medicare Appeals Council granting Plaintiff's request for escalation ("Order") is attached hereto as **Exhibit "B."**

6. Plaintiff contends that the ALJ violated the Practice's right to procedural due process, improperly denied reimbursement for reasonable and medically necessary services provided by Plaintiff to Medicare beneficiaries, and improperly determined that Plaintiff was not entitled to a limitation or complete waiver of liability.

## PARTIES

7. Plaintiff is a limited liability company organized under the laws of Pennsylvania with its principal place of business in Allentown, Lehigh County, Pennsylvania.

8. Secretary Robert F. Kennedy, Jr., is the Secretary of HHS, in which capacity he is responsible for the conduct and policies of HHS, including the Centers for Medicare and Medicaid Services ("CMS"), its contractors, and for administering the Medicare program. Secretary Kennedy is named in his official capacity.

## JURISDICTION, VENUE, AND TIMELINESS

9. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 405(g), as incorporated by 42 U.S.C. § 1395ff(b), and 5 U.S.C. § 702.

10. The total amount in controversy is approximately $232,783.90, which far exceeds the jurisdictional requirement in 42 U.S.C. § 1395ff(b)(1)(E)(i) and 42 C.F.R. § 405.1136(a)(1).

11. Venue is proper pursuant to 42 U.S.C. § 405(g) and 42 C.F.R. § 405.1136(b)(1).

12. The Order was received by Plaintiff on August 20, 2026. This action is therefore timely pursuant to 42 C.F.R. § 1130, 42 C.F.R. § 405.1132(b) and 42 C.F.R. § 1136(c).

## THE MEDICARE PROGRAM

13. The Medicare Act establishes a federal government program that provides health care coverage to the aged and disabled. *See* 42 U.S.C. §§ 1395–1395lll.

14. This action arises solely under Medicare Part B—Supplemental Medical Insurance Benefits for Aged and Disabled ("Part B"), which concerns covering basic non-hospital medical needs. *See* 42 U.S.C. § 1395j–1395w-6.

15. Under Part B, Medicare generally covers items and services that are "reasonable and necessary" for the treatment of Medicare beneficiaries. *See* 42 U.S.C. § 1395y(a)(1)(A).

16. To obtain payment for reasonable and necessary items and services, healthcare providers participating in Medicare submit claims for reimbursement to a Medicare Administrative Contractor ("MAC"), a private entity that processes claims in a geographic region assigned by HHS. The MAC makes an initial determination as to whether an item or service qualifies for reimbursement in that specific geographic region. *See* 42 U.S.C. § 1395kk-1(a)(4)(A); 42 C.F.R. § 405.920.

17. A healthcare provider that is dissatisfied with an initial determination may pursue an administrative appeal. *See* 42 C.F.R. § 405.904.

18. The administrative appeal process involves the following: (1) a redetermination by the MAC; (2) a reconsideration by a Qualified Independent Contractor ("QIC"); (3) a hearing before an Administrative Law Judge ("ALJ"); and (4) a review by the Council. *See* 42 C.F.R. § 405.904(a)(2); 42 U.S.C. § 1395ff.

19. A healthcare provider that exhausts its administrative appeals may seek judicial review in federal district court. 42 C.F.R. § 405.904(b)(1); *see also* 42 U.S.C. § 405(g).

20. To provide some consistency and uniformity in coverage determinations, HHS has established a process for creating Local Coverage Determinations ("LCDs") and National Coverage Determinations ("NCDs"), which process requires opportunity for notice and comment. *See* 42 U.S.C. § 1395y(l). NCDs provide nationwide coverage determinations for particular items or services and LCDs provide coverage determinations for particular items or services within a specific jurisdiction. *See* 42 U.S.C. § 1395y(l)(6).

## FACTUAL AND PROCEDURAL HISTORY

21. Plaintiff is a podiatric clinic that employs podiatric physicians to provide treatment to Medicare beneficiaries, among other patients, in or around Allentown, Pennsylvania.

22. Plaintiff is owned by Michelle McCarroll, DPM ("Dr. McCarroll"), a podiatric physician licensed in Pennsylvania.

21. Between February 9, 2021, and April 20, 2021, Dr. McCarroll treated two Medicare beneficiaries suffering from chronic wounds, including venous and diabetic ulcers.

22. After conversative care failed, Dr. McCarroll treated the Medicare beneficiaries' wounds with a skin substitute to promote wound healing.

23. The skin substitute used by Dr. McCarroll, and subject of this litigation, is Healthcare Common Procedure Coding System ("HCPCS") code Q4159 ("Affinity").

24. After treating the Medicare beneficiaries' chronic wounds with Affinity, Plaintiff submitted claims for reimbursement to the respective MAC, Novitas Solutions, Inc. ("Novitas").

25. The services at issue were initially paid but were later subjected to a post-payment audit conducted by Cotiviti GOV Services ("Cotiviti"), the Recovery Audit Contractor ("RAC") established to ensure the integrity of claims paid by Medicare.

26. Plaintiff did not receive any review results from Cotiviti but, on January 17, 2024, Plaintiff received a demand from Novitas seeking repayment of $232,783.90.

27. Pursuant to 42 C.F.R. § 405.940, Plaintiff timely requested redetermination on April 8, 2024.

28. Novitas issued unfavorable redetermination decisions on May 13, 2024, and May 14, 2024.

29. Novitas denied payment for the services after finding that Plaintiff did not submit any medical records for review.

30. Pursuant to 42 C.F.R. § 405.960, Plaintiff timely requested reconsideration by the QIC on November 5, 2024.

31. The relevant medical records relating to the services at issue were included in Plaintiff's reconsideration request.

32. On December 20, 2024, the QIC issued an unfavorable reconsideration decision.

33. Despite receiving the medical records, the QIC found the services at issue were unreasonable and not medically necessary on the sole basis that "there is insufficient support from double-blinded, randomized human clinical trials for safety and effectiveness when used as a wound covering to treat the specific condition at issue."

34. Plaintiff appealed the QIC's reconsideration decision to the ALJ on February 12, 2025, pursuant to 42 C.F.R. § 405.1000.

35. An ALJ hearing before the Honorable Wendy A. Weber was held on April 9, 2025.

36. Plaintiff's counsel in the administrative process, Dr. McCarroll, and Plaintiff's experts appeared and provided testimony on behalf of Plaintiff at the ALJ hearing, which testimony

related specifically to medical literature supporting the safety and efficacy of skin substitutes like Affinity.

37. While Cotiviti submitted a position paper prior to the ALJ hearing, Cotiviti did not appear, participate, or provide testimony at the ALJ hearing, nor did any other CMS contractor.

38. On May 21, 2025, the ALJ issued a partially favorable Decision.

39. Although partially favorable, the ALJ denied payment on many of the claims appealed by Plaintiff after finding that Plaintiff's documentation relating to the services at issue did not satisfy coverage criteria.

40. Specifically, the ALJ erroneously found as a factual matter that the medical records for the two beneficiaries at issue showed active or unresolved infections at the time the services involving Affinity were rendered by Dr. McCarroll.

41. The ALJ also found that Plaintiff was not entitled to any liability limitation or waiver.

42. On July 17, 2025, Plaintiff appealed the unfavorable portions of the Decision to the Council and submitted briefing detailing the errors made by the ALJ.

43. On August 6, 2026, Plaintiff requested permission from the Council to escalate the appeal to this Court since the Council failed to issue a decision within ninety (90) days of Plaintiff's appeal of the unfavorable portions of the Decision to the Council.

44. On August 20, 2026, the Council issued its Order allowing escalation.

**COUNT I: VIOLATION OF DUE PROCESS**

45. Plaintiff incorporates the information set forth in paragraphs 1 through 44 as though fully set forth herein.

46. Plaintiff is entitled to due process, which requires meaningful notice of what will be covered at a hearing before an ALJ.

47. Plaintiff was entitled to notice of any new issues that the ALJ might consider at the ALJ hearing pursuant to 42 C.F.R. § 405.1032(b)(2).

48. The ALJ failed to inform Plaintiff of material factors that would lead to an adverse decision against Plaintiff, *i.e.*, that the ALJ was reviewing medical records to determine whether the medical records satisfied coverage criteria.

49. More specifically, the ALJ did not give notice that the presence of an infection was an area of inquiry.

50. The ALJ's lack of meaningful notice violated Plaintiff's procedural due process rights.

51. The ALJ's violation was material because the ALJ denied payment solely based on alleged insufficient documentation.

**COUNT II: ADMINISTRATIVE FINDINGS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

52. Plaintiff incorporates the information set forth in paragraphs 1 through 51 as though fully set forth herein.

53. Pursuant to 42 C.F.R. § 405(g), the ALJ's factual findings must be supported by substantial evidence.

54. The Decision is not supported by substantial evidence.

55. The Decision ignores evidence submitted by Plaintiff and ignored overwhelming objective evidence that contradicts the ALJ's ultimate conclusions.

56. Specifically, the ALJ ignored Plaintiff's experts' evidence and testimony on Affinity, overwhelming objective evidence regarding the safety and efficacy of Affinity,

overwhelming objective evidence that the services at issue met coverage criteria, and overwhelming objective evidence regarding Plaintiff's exercise of reasonable care in billing and accepting payment for the services at issue.

57. Because the Decision is not based on substantial evidence, Plaintiff has been erroneously denied benefits to which Plaintiff is entitled.

58. The ALJ's failures have caused Plaintiff significant financial harm.

**COUNT III: FAILURE TO APPLY PROPER LEGAL STANDARDS AND REGULATIONS**

59. Plaintiff incorporates the information set forth in paragraphs 1 through 58 as though fully set forth herein.

60. The ALJ is required to follow all laws and regulations relating to the Medicare program.

61. The ALJ committed reversible legal error by failing to apply the correct legal standards and governing regulations.

62. Specifically, the ALJ erred in misapplying the laws, rules and regulations relating to coverage for the services and issue and to Plaintiff's limitation or waiver of liability.

63. The ALJ's failure to adhere to applicable law and regulations violated Plaintiff's legal rights necessitating reversal or remand of the Decision.

**COUNT IV: INVALID AND UNLAWFUL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706**

64. Plaintiff incorporates the information set forth in paragraphs 1 through 63 as though fully set forth herein.

65. The ALJ erroneously found that the services at issue were not entitled to payment by Medicare and that Plaintiff was not entitled to a limitation or waiver of liability.

66. The erroneous rulings are arbitrary and capricious, an abuse of discretion, or otherwise unlawful.

67. Plaintiff has no other adequate administrative or other remedy to address the ALJ's unlawful action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. For an order reversing the Decision that Plaintiff was not entitled to payment for the services at issue involving Affinity and/or that Plaintiff was not entitled to a complete waiver of liability.

B. For an order requiring CMS to reimburse Plaintiff for the services at issue inclusive of all interest accrued.

C. Alternatively, for an order remanding this case to the ALJ with instructions to develop the record relating to Plaintiff's medical records relating to the services rendered involving Affinity.

D. For such other and further legal and equitable relief as the Court deems just and proper.

Respectfully submitted,

**HILL FENSTERMAKER, LLC**

**By: /s/John R. Hill, Esquire**
Attorney ID No. 54046
1 W. Broad St, Suite 240
Bethlehem, PA 18018
(610) 694-1100
john@hillfenstermaker.com
Attorney for Plaintiff
That Foot Doctor, LLC

Date: September 28, 2026

# EXHIBIT "A"

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Irvine Field Office
19 Technology Drive
Suite 200
Irvine, CA 92618-2364
(949) 788-8000
(949) 372-4683 (Direct)
949-788-3660 (Fax)
(866) 495-7414 (Toll Free)

May 21, 2025

PARSONS BEHLE AND LATIMER
ATTN: J KEVIN WEST
800 W MAIN ST
STE 1300
BOISE, ID 83702

**NOTICE OF DECISION**

Appellant: THAT FOOT DOCTOR, LLC
OMHA Appeal Number: 3-14706151359

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

**What if I disagree with the decision?**

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**How much time do I have to file an appeal?**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**How do I file an appeal?**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**<u>How will the Medicare Appeals Council respond to my appeal?</u>**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**<u>Questions?</u>**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

QIC - C2C B North
301 W Bay Street
Ste. 1110
Jacksonville, FL 32202

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List
Attachment A

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Irvine, CA

| | | | |
|---|---|---|---|
| Appeal of: | THAT FOOT DOCTOR, LLC | OMHA Appeal No.: | 3-14706151359 |
| Beneficiary: | Multiple (See Attachment A) | Medicare Part: B | |
| Medicare No.: | Multiple (See Attachment A) | Before: | Wendy A. Weber<br>**U.S. Administrative Law Judge** |

## DECISION

After carefully considering the evidence and arguments presented in the record, this Decision is **PARTIALLY FAVORABLE.**

## Procedural History

That Foot Doctor, LLC (Appellant) submitted four claims for payment under Medicare Part B for Skin Sub Graft Face/Nk/Hf/G (15275) and Affinity 1 Square Cm (Q4159) provided to Beneficiary #1 on February 9, 2021, February 23, 2021, March 9, 2021, and March 16, 2021. Exh. 2, p. 9. The Appellant also submitted six claims for payment under Medicare Part B for 15275: Skin Sub Graft Face/Nk/Hf/G (15275) and Affinity 1 Square Cm (Q4159) provided to Beneficiary #2 on February 9, 2021, March 16, 2021, March 23, 2021, March 30, 2021, April 6, 2021, and April 13, 2021. *Id.* at 4. Novitas, the Medicare Administrative Contractor, denied payment at initial determination and redetermination on the basis that the items were not a medical necessity. The Appellant requested reconsideration from C2C Innovative Solutions Inc., a Qualified Independent Contractor (QIC), which upheld the denials. Exh. 3.

The Appellant disagreed with the QIC's decisions and timely filed a Request for Hearing before an Administrative Law Judge. Exh. 1. The amount in controversy meets the jurisdictional requirement. 42 C.F.R. §405.1006(b); 87 Fed. Reg. 59437 (Sept. 30, 2022). A Notice of Hearing was sent to the Appellant and the QIC. Exh. 7; 42 C.F.R. §405.1020.

A telephone hearing was held as noticed on April 9, 2025, before Wendy A. Weber, Administrative Law Judge, in Irvine, California. Hearing Audio. The Appellant appeared, represented by Kevin West, Esq. Also appearing on behalf of the Appellant were Michelle McCaroll, DPM, Adrianne Ross, DPM and Michael Demi, RN, CHC, CPC, CPMA, CSFAC. Cotiviti submitted a position paper in lieu of appearing. Exh. 16. Exhibits 1 to 16 were admitted into evidence without objection. Hearing Audio.

## Issues

1. Whether payment should be made under Medicare Part B for Skin Sub Graft Face/Nk/Hf/G (15275) and Affinity 1 Square Cm (Q4159) provided to Beneficiary #1 on February 9, 2021, February 23, 2021, March 9, 2021, and March 16, 2021, and to Beneficiary #2 on February 9, 2021, March 16, 2021, March 23, 2021, March 30, 2021, April 6, 2021, and April 13, 2021, pursuant to Title XVIII of the Social Security Act (the Act)?

2. If the services are not covered, whether liability of the Appellant or the Beneficiary may be limited or waived pursuant to Section 1879 of the Act and 42 C.F.R. Section 411.406, and if so, for whom?

3. If an overpayment is found to exist, whether the Waiver of Overpayment Liability provisions of Section 1870 of the Act apply and, if so, to whom.

## Applicable Law and Policy

### I. Administrative Law Judge Review Authority

#### *A. Jurisdiction*

An individual who, or an organization that, is dissatisfied with the reconsideration of an initial determination is entitled to a hearing before the Secretary of the Department of Health and Human Services (HHS), provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner. Section 1869(b)(1)(A) of the Act. In implementing this statutory directive, the Secretary has delegated authority to administer the nationwide hearings and appeals system for the Medicare program to the Office of Administrative Hearing (OMHA). 70 Fed. Reg. 36386, 36387 (June 23, 2005). Administrative Law Judges with OMHA issue the final decisions of the Secretary, except for decisions reviewed by the Medicare Appeals Council. *Id.*

A hearing before an Administrative Law Judge is available only if the remaining amount in controversy is $180 or more. 85 Federal Register 60795 (September 28, 2020). The request for hearing is timely filed if filed within 60 days after receipt of a QIC decision. 42 C.F.R. §405.1002.

#### *B. Scope of Review*

Under the Centers for Medicare and Medicaid Services' (CMS) implementation policy for the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), Pub. Law 106-554, app. F, 114 Stat. 2763, 2763A-463, and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), Pub. Law 108-173, 117 Stat. 2066, all initial determinations by CMS contracted Carriers are governed by the Administrative Law Judge hearing procedures set forth at 20 C.F.R. §§404.929 through 404.961 and 42 C.F.R. §405.855. 70 Fed. Reg. 11420, 11424-26 (Mar. 8, 2005).

The issues before the Administrative Law Judge include all the issues brought out in the initial, reconsidered, or revised determination that were not decided entirely in the appellant's favor. However, if evidence presented before or during the hearing causes the Administrative Law Judge to question a fully favorable determination, he or she will notify the appellant and will consider it an issue at the hearing. 42 C.F.R. §405.1032(a).

### C. *Standard of Review*

Administrative Law Judges with OMHA conduct a "de novo" review and issue decisions based on the hearing record. 42 C.F.R. §405.1000(d). In fulfilling this role, an Administrative Law Judge qualified and appointed pursuant to the Administrative Procedure Act acts as an independent finder of fact in conducting a hearing pursuant to section 1869 of the Act. This requires a new consideration of the facts and law.

## II. Principles of Law

### A. *Statutes and Regulations*

The Medicare Part B program entitles a beneficiary to have payment made to him or her on his or her behalf for medical and other health services. Social Security Act §1832(a)(1); *see also* 42 C.F.R. §410.3(a)(1). Coverage of medical and other health services is qualified by the overarching principles of sections 1862(a) and 1833(e) of the Social Security Act.

Section 1831 of the Act established a supplemental medical insurance program for the aged and disabled. Coverage of medical and other health services is qualified by the overarching principles of sections 1862(a) and 1833(e) of the Act. Section 1862(a) limits Medicare payments to items or services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," notwithstanding any other provision of Title XVIII of the Act. *See also* 42 C.F.R. §411.15(k)(1). Section 1833(e) of the Act requires a claim for payment under Medicare Part B to be supported by sufficient information and documentation. *See also* 42 C.F.R. §424.5(a)(6). Similarly, experimental, and investigational devices are not covered. 42 C.F.R. §411.15.

Section 1832(a) of the Act states that beneficiaries are entitled to, among other benefits, "medical and other health services." In turn, "medical and other health services" is defined, in relevant part to include hospital services (including drugs and biologicals which are not usually self-administered by the patient) incident to physicians' services rendered to outpatients and partial hospitalization services incident to such services. Section 1861(s)(2)(B) of the Act.

Section 1879 of the Act provides that when Medicare excludes payment and coverage pursuant to Section 1862(a)(1) of the Act, payment may nevertheless be made for items or services if neither the beneficiary nor the provider or supplier knew, and could not reasonably be expected to have known, that the items or services would not be covered or payable by Medicare. CMS Regulations consider a provider or supplier to have known that items or services would not be covered or payable by Medicare if they are given direct notice of this by CMS, Medicare Intermediaries, Medicare Carriers, utilization review committees, or by the beneficiary's attending physician. 42 C.F.R. §411.406(b) and (c). A provider or supplier is considered to have notice that services are not covered if the beneficiary informs the provider or supplier of the non-coverage. 42 C.F.R. §411.406(d). A provider or supplier is also considered to have notice that services are not covered if it is clear that the provider or supplier should have known of Medicare's coverage criteria based on the receipt of notices from CMS or its agents, or publication in the Federal Register, or based on the provider or supplier's "knowledge of what are considered acceptable standards of practice by the local medical community." 42 C.F.R. §411.406(e).

Under Section 1870(b) of the Act, if a provider is without fault with respect to an overpayment it

received, or may be deemed without fault, in the absence of evidence to the contrary, where the overpayment determination was made subsequent to the third calendar year after notice of payment of the claim, then it may not be held liable for the overpayment. Section 1870(b) of the Act.

### *B. Policy and Guidance*

Section 1871(a)(2) of the Act states that unless promulgated as a regulation by CMS, no rule, requirement, or statement of policy, other than a National Coverage Determination ("NCD"), can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. See also 42 C.F.R. § 405.860. However, in lieu of binding regulations with the full force and effect of law, CMS and its contractors have issued policy guidance that describe criteria for coverage of selected types of medical items and services in the form of manuals and local medical review policies ("LMRPs") or local coverage determinations ("LCDs").

The Food and Drug Administration (FDA) created an electronic registration and listing system for companies that manufacture human cells, tissues, and cellular and tissue-based products (HCT/P's) and to establish donor-eligibility, current good tissue practice, and other procedures to prevent the introduction, transmission, and spread of communicable diseases by HCT/P's. 21 C.F.R. § 1271. In determining whether §1271 applies to HCT/Ps, definitions of terms are provided. Under §1271.10(a)(2), the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent. Section 1271.3(c) defines "Homologous use" as the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. Moreover, Section 1271.3(d) further explains:

> (d) Human cells, tissues, or cellular or tissue-based products (HCT/Ps) means articles containing or consisting of <u>human cells or tissues</u> that are intended for implantation, transplantation, infusion, or transfer into a human recipient. Examples of HCT/Ps include, but are not limited to, bone, ligament, skin, dura mater, heart valve, cornea, hematopoietic stem/progenitor cells derived from peripheral and cord blood, manipulated autologous chondrocytes, epithelial cells on a synthetic matrix, and semen or other reproductive tissue.
>
> The following articles are not considered HCT/Ps:
>
> (6) Cells, tissues, and organs <u>derived from animals</u> other than humans.
>
> 21 C.F.R. §1271(d)(6) (Emphasis added).

21 C.F.R. §1271.10 and 21 C.F.R. § 1271.3 provide, in pertinent part, as follows:

> 21 C.F.R §1271.10 addresses whether HCT/P's are regulated solely under section 361 of the PHS Act and the regulations in this part, and if so what is required:
>
> (a) An HCT/P is regulated solely under section 361 of the PHS Act and the regulations in this part if it meets all the following criteria:
>
> (1) The HCT/P is minimally manipulated;

(2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;

(3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and

(4) Either:

(i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or

(ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:

*(a)* Is for autologous use;

*(b)* Is for allogeneic use in a first-degree or second-degree blood relative; or

*(c)* Is for reproductive use.

21 C.F.R.§ 1271.3 provides definitions of important FDA terms in this part:

The following definitions apply only to this part:

(c) *Homologous use* means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor.

(d) *Human cells, tissues, or cellular or tissue-based products (HCT/Ps)* means articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient. Examples of HCT/Ps include, but are not limited to, bone, ligament, skin, dura mater, heart valve, cornea, hematopoietic stem/progenitor cells derived from peripheral and cord blood, manipulated autologous chondrocytes, epithelial cells on a synthetic matrix, and semen or other reproductive tissue. The following articles are not considered HCT/Ps:

**(1)** Vascularized human organs for transplantation;

**(2)** Whole blood or blood components or blood derivative products subject to listing under parts 607 and 207 of this chapter, respectively;

**(3)** Secreted or extracted human products, such as milk, collagen, and cell factors; except that semen is considered an HCT/P;

**(4)** Minimally manipulated bone marrow for homologous use and not combined with another article (except for water, crystalloids, or a sterilizing, preserving, or storage agent, if the addition of the agent does not raise new clinical safety concerns with respect to the bone marrow);

**(5)** Ancillary products used in the manufacture of HCT/P;

**(6)** Cells, tissues, and organs derived from animals other than humans; and

**(7)** In vitro diagnostic products as defined in § 809.3(a) of this chapter.

(8) Blood vessels recovered with an organ, as defined in 42 CFR 121.2, that are intended for use in organ transplantation and labeled "For use in organ transplantation only."

(e) *Manufacture means,* but is not limited to, any or all steps in the recovery, processing, storage, labeling, packaging, or distribution of any human cell or tissue, and the screening or testing of the cell or tissue donor.

At the time of the dates of service, the Medicare Contractor issued LCD L35041, relating to the Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds (orig. det. eff. date Oct. 1, 2015) (rev. eff. date Sept. 2019). It provides in pertinent part:

**Coverage Guidance**

There are currently a wide variety of bioengineered products available for soft tissue coverage to affect closure. These products may be derived from allogeneic, xenogeneic, synthetic sources or a combination of any or all these types of materials. However, without the component of the recipient's own distinct epithelium and cellular skin elements, permanent skin replacement or coverage by the graft cannot be accomplished. These include:

**Autologous skin grafts,** also referred to as autografts, are permanent covers that use skin from different parts of the individual's body. These grafts consist of the epidermis and a dermal component of variable thickness. A split-thickness skin graft (STSG) includes the entire epidermis and a portion of the dermis. A full thickness skin graft (FTSG) includes all layers of the skin. Although autografts are the optimal choice for full thickness wound coverage, areas for skin harvesting may be limited, particularly in cases of large burns or venous stasis ulceration. Harvesting procedures are painful, disfiguring and require additional wound care.

**Allografts** which use skin from another human (e.g., cadaver) and **Xenografts** which use skin from another species (e.g., porcine or bovine) may also be employed as temporary skin replacements, but they must later be replaced by an autograft or the ingrowth of the patient's own skin.

**Bioengineered Skin / Cultured Epidermal Autografts (CEA)** are autografts derived from the patient's own skin cells grown or cultured from very small amounts of skin or hair follicle. Production time is prolonged. One such product is grown on a layer of irradiated mouse cells, bestowing some elements of a xenograft. Widespread usage has not been available due to limited availability or access to the technology.

**Regulatory Status**

**US Food and Drug Administration (FDA) Governing CTP Products**

The U.S. Food and Drug Administration (FDA) does not refer to any product or class of products as "skin substitutes." However, products commonly described as "CTPs" are regulated by FDA under one of the four categories described below depending on the origin and composition of the product and listed as a "CTP."

1. **Human Cells, Tissues, and Cellular and Tissue-Based Products -** Cells and tissues taken from human donors and transplanted to a recipient are regulated under PHS 361 [21 CFR 1270 & 1271]. This regulation describes the rules concerning the use of

HCT/Ps for human medical purposes. The final rule, 21 CFR Part 1271, became effective on April 4, 2001, for human tissues intended for transplantation that are regulated under section 361 of the PHS Act and 21 CFR Part 1270. HCT/Ps are regulated by the Center for Biologics Evaluation and Research (CBER). CBER is responsible for regulating biological and related products including blood, vaccines, allergenics, tissues, and cellular and gene therapies. Establishments producing HCT/Ps must register with FDA and list their HCT/Ps. HCT/Ps establishments are not required to demonstrate the safety or effectiveness of their products and FDA does not evaluate the safety or effectiveness of these products. Products are recovered, processed, and distributed in compliance with FDA Good Tissue Practices and American Association of Tissue Banks (AATB) standards, maintain the necessary registration with the FDA, and undergo routine FDA inspection.

2. **Premarket Approval -** Premarket approval (PMA) by FDA is the required process of scientific review to ensure the safety and effectiveness of Class III devices. Before Class III devices can be marketed, they must have an approved PMA application. Therefore, wound care products regulated under the PMA process will require evidence that they promote wound healing before they are approved for marketing.

3. **510(k) Submissions -** According to FDA documents a "510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent (SE), to a legally marketed device (21 CFR 807.92(a)(3)) that is not subject to PMA." Submitters must compare their device to one or more similar legally marketed devices and make and support their substantial equivalency claims. Unlike PMA, 510(k) confers reasonable assurance of safety and effectiveness via demonstration of substantial equivalence to a legally marketed device that does not require premarket approval. Therefore, wound care products regulated under the 510(k) process will not typically require clinical evidence to establish effectiveness in wound healing, as compared with products regulated under the PMA process in which substantial clinical evidence is always required.

Non-graft wound dressings are generally included in standard wound care management; such products may provide value and, in fact, may preclude the need for CTP application.

Patients receiving a skin substitute graft must be under the care of a physician licensed by the state with full scope of practice for the treatment of the systemic disease process(es) etiologic for the condition (e.g., venous insufficiency, diabetes, neuropathy). This concurrent medical management and the identity of the managing medical physician shall be clearly discernable in the medical record and available upon request.

Medicare coverage for wound care on a continuing basis, for a single wound, in an individual patient is contingent upon evidence documented in the patient's medical record that the wound is improving in response to the wound care being provided. Since it is neither reasonable nor medically necessary to continue a given type of wound care in the absence of wound improvement, it is expected that the wounds response to treatment will be documented in the

medical record at least once every 30 days for each episode of wound treatment and made available to the contractor upon request.

Documentation of response requires measurements of the initial ulcer, measurements at the completion of at least four weeks of appropriate wound care and measurements immediately prior to placement and with each subsequent placement of the bioengineered skin substitute or CTP.

**Covered Indications**

Chronic Wounds are defined as wounds that do not respond to standard wound treatment for at least a 30-day period during organized comprehensive conservative therapy.

Medicare covers application of skin substitutes to Ulcers or Wounds with a failed response that are:

- Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
- Skin deficit at least 1.0 square centimeter (cm) in size;
- Clean and free of necrotic debris or exudate;
- Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
- For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.

Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.

Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:

- Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.
- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.
- Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.

In all wound management, the ulcer must be free of infection and underlying osteomyelitis with documentation of the conditions that have been treated and resolved prior to the institution of

skin substitute therapy. For purposes of this LCD, appropriate therapy includes, but is not limited to:

- Control of edema, venous hypertension or lymphedema
- Control of any nidus of infection or colonization with bacterial or fungal elements
- Elimination of underlying cellulitis, osteomyelitis, foreign body, or malignant process
- Appropriate debridement of necrotic tissue or foreign body (exposed bone or tendon)
- For diabetic foot ulcers, appropriate non-weight bearing or off-loading pressure
- For venous stasis ulcers, compression therapy provided with documented diligent use of multilayer dressings, compression stockings of greater than 20 mmHg pressure, or pneumatic compression
- Provision of wound environment to promote healing (protection from trauma and contaminants, elimination of inciting or aggravating processes)

## Findings of Fact and Analysis

As stated in LCD L35041, in effect on the dates of service, chronic wounds are defined as wounds that do not respond to standard wound treatment for at least a 30-day period during organized comprehensive conservative therapy. LCD L35041further states that Medicare covers application of skin substitutes to Ulcers or Wounds with a failed response that are:

- Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
- Skin deficit at least 1.0 square centimeter (cm) in size;
- Clean and free of necrotic debris or exudate;
- Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
- For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.

Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:

- Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.
- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.

Additionally, LCD L35041 provides that in all wound management, the ulcer must be free of infection and underlying osteomyelitis with documentation of the conditions that have been treated and resolved prior to the institution of skin substitute therapy. For purposes of this LCD, appropriate therapy includes, but is not limited to:

- Control of edema, venous hypertension or lymphedema
- Control of any nidus of infection or colonization with bacterial or fungal elements
- Elimination of underlying cellulitis, osteomyelitis, foreign body, or malignant process
- Appropriate debridement of necrotic tissue or foreign body (exposed bone or tendon)
- For diabetic foot ulcers, appropriate non-weight bearing or off-loading pressure

- For venous stasis ulcers, compression therapy provided with documented diligent use of multilayer dressings, compression stockings of greater than 20 mmHg pressure, or pneumatic compression
- Provision of wound environment to promote healing (protection from trauma and contaminants, elimination of inciting or aggravating processes)

In its position paper, Cotiviti pointed out that it received no response to medical documentation requests during its post payment reviews. Exh. 16. Because no response was provided by the Appellant within 45 days of its last request, Cotiviti argued that the requirements of 42 C.F.R. §424.5(a)(6) were not met and payment should not be made. *Id.* at 3.

At the hearing, Mr. West noted new LCDs and local coverage articles (LCAs) regarding skin substitutes which were not available regarding the product provided to the Beneficiaries on the dates of service.[1] Hearing Audio. Mr. West challenged the QIC ruling and pointed out that the skin substitute product at issue, Affinity, is not a fluid allograft, but a human cell, tissue based product. Dr. McCaroll is a licensed podiatric physician and described the procedures and wound treatment provided to the Beneficiaries and why the treatments were pursued. *Id*

Ms. Demi reviewed the medical records and prepared a written report. Hearing Audio. She concluded all the services provided to the Beneficiaries were coded correctly. Dr. Ross also reviewed the medical records, prepared a written report, and provided expert opinions on the use of Affinity for these Beneficiaries. She explained that Affinity was used as a wound covering and barrier. She further emphasized that Dr. McCaroll properly administered Affinity for the Beneficiaries and correctly documented the conservative treatments tried and measurements of the Beneficiaries wounds. Dr. Ross also pointed out that Affinity is not an amniotic "fluid" allograft, but rather, an allograft from donated amniotic-derived human tissue, or a "placental allograft." *Id.* Dr. Ross asserted that there was peer reviewed literature in support of Affinity use for diabetic patients, and concluded the Appellant's use of the product for the Beneficiaries was medically reasonable and necessary. *Id.*

I. <u>Beneficiary #1—</u>

**Claims:** 4824004660005, 4824004660007, 4824004660009 and 4824004660010
**Dates of Service:** February 9, 2021 to March 16, 2021
**ALJ Decision:** Unfavorable

A. <u>Findings of Fact</u>

1. On February 3, 2021, the 55-year-old Beneficiary presented to the Appellant with a chief complaint of wound dehiscence, right ulcer. Exh. 15, p. 63. The Beneficiary presented emergently 3.5 weeks status post partial 1st ray amputation of the right foot performed by Dr. Chatman at the University of Pennsylvania, who felt there was adequate perfusion to heal this procedure. The Beneficiary experienced limited ambulation in darcowedge shoe of the right foot; noticed excessive drainage on outer ace wrap and redness of foot to perform local wound care of bacitracin; currently undergoing hyperbaric therapy, completed 2.5 weeks of hyperbaric therapy for the right foot; currently on Cipro; and stopped smoking prior to the amputation. The Beneficiary was diabetic and last saw her primary care physician on October 6, 2020.

[1] CMS has prepared a "future effective" LCD for skin substitute grafts/cellular and tissue-based products for the treatment of diabetic foot ulcers and venous leg ulcers, but the effective date will be delayed until January 1, 2026. www.cms.gov/ newsroom/press-releases/cms-statement-local-coverage-determination-certain-skin-substitute-grafts (4/11/25) (last accessed 5/2/25).

Problems included osteomyelitis onset January 28, 2021; open wound of toe, onset November 5, 2020; neuropathy due to diabetes mellitus, onset November 5, 2020; and ulcer of toe, right, onset November 5, 2020. Past medical history included bleeding disorder; coronary artery disease; diabetes mellitus; dialysis; dyslipidemia; heart disease; hypertension; kidney disease; liver disease; lung disease; and osteoporosis. Physical examination noted ankle equinus for inspection of heels. Procedure documentation noted ulcer debridement, excisional. Assessment was dehiscence of surgical wound; ulcer of right foot; cellulitis of right lower limb. Plan was to continue wound care with bacitracin; oral antibiotics; ambulate in darcowedge shoe to offload right foot amputation site. The Beneficiary was instructed to never walk barefoot. Further surgical interventions of a transmetatarsal amputation (TMA) for healing of the wound may be required if the Beneficiary failed any wound treatment therapy. Limb salvage would be attempted. Follow up was scheduled in one week to examine the right foot. *Id.* at 63-66.

2. On February 9, 2021, the Beneficiary returned to the Appellant for follow-up of ulcerated wound dehiscence, present for 4.5 weeks. Exh. 15, p. 67. Physical exam noted ulcer of the right foot with thick hyperkeratotic rim measuring 7.1 cm x 1.0 cm x 0.2 cm, partially granular and partially fibrotic. No purulent drainage but moderate clear yellowish serosanguinous drainage noted. Osteomyelitis onset on January 28, 2021, was also noted. Wound Product Initial Application states that due to the longevity of the ulcer and lack of response to traditional wound care, an initial application of Affinity to the Beneficiary's right foot was performed as well as excisional debridement. Affinity was placed on the wound bed. Amount used was 28 sq cm, none wasted. Assessment was ulcer of toe, right, non-pressure, chronic ulcer with necrosis of muscle. *Id.* at 67-69.

3. On February 23, 2021, the Beneficiary presented to for follow-up evaluation of ulcerated wound dehiscence present for 6.5 weeks. Exh. 15, p. 71. Improvement of the wound was noted, with decrease in size of ulcer, measuring 6.9 cm x 2.2 cm x 0.2 cm, as well as an increase in granulation tissue. Wound Product Reapplication of Affinity and excisional debridement was performed. Amount used was 28 sq cm, none wasted. Assessment was ulcer of the right toe, nonpressure, chronic with necrosis of muscle. High risk for amputation was noted. It was recommended that the Beneficiary visit Lehigh Valley Physician Group vascular to access blood perfusion to the right foot and possible revascularization for perfusion to heal the ulcer. The Beneficiary continued to refuse treatment at Lehigh Valley Health Network wound care center. The Beneficiary was advised it was possible to proceed with another advance wound healing graft since there has been improvement in the ulcer since last application. Follow up in one week was scheduled to evaluate the ulcer. *Id.* at 71-73.

4. On March 2, 2021, the Beneficiary presented for evaluation of ulcerated wound dehiscence of the right foot, present for 7.5 weeks. Exh. 15, p. 75. Chief complaint was follow up of ulcer of toe. The Beneficiary had completed an oral course of Cipro. The Beneficiary stopped hyperbaric treatment due to the hardship of travel to treatment location. The Beneficiary reported no wound pain, but did report numbness, redness and drainage and previous treatments provided minimal improvement. Treatments included local wound care, Puraply XT, Affinity and oral antibiotics. Physical exam noted ankle equinus for inspection of heels. Wound Product Reapplication of Affinity states 21 sq cm used, none wasted. Assessment was ulcer of

the right toe. The plan was to keep bandages dry and intact and continue to offload the right foot with dacrowedge shoe. Limited activity was recommended and to be non-weight bearing as much as possible. The Beneficiary continued to defer treatment at the wound care center. Follow up was scheduled in one week. *Id.* at 75-78.

5. On March 9, 2021, the Beneficiary presented for evaluation of ulcerated wound dehiscence of the right foot, present for 8.5 weeks. Exh. 15, p. 79. The Beneficiary underwent dialysis three times per week. The Beneficiary reported no wound pain, but did report numbness, redness and drainage and previous treatments provided minimal improvement. Wound Product Reapplication of Affinity states 28 sq cm used, none wasted. Assessment was ulcer of the right toe. Plan was to continue to ambulate in the dacrowedge shoe and keep bandages dry and intact. The Beneficiary continued to refuse treatment at the wound care center, since there had been improvement in wound size and wished to continue treatment with the Appellant. Follow up was scheduled in one week. *Id.* at 79-82.

6. On March 16, 2021, the Beneficiary presented for evaluation of ulcerated wound dehiscence of the right foot, present for 9.5 weeks. Exh. 15, p. 83. Chief complaint was follow up of ulcer of toe. The Beneficiary reported no wound pain, improving and chronic, but did report numbness, redness and drainage and previous treatments provided minimal improvement. Wound Product Reapplication of Affinity states 28 sq cm used, none wasted. The plan was to keep bandages dry and intact and continue pressure precautions. *Id.* at 83-85.

7. On March 23, 2021, the Beneficiary presented for evaluation of ulcerated wound dehiscence of the right foot, present for 10.5 weeks. Exh. 15, p. 87. Chief complaint was peripheral vascular disease (PVD); ischemia; and follow up of ulcer toe. The Beneficiary reported extreme ischemic rest pain during the past 24 hours, taking Dilaudid and Cipro; ambulating in sneaker; and began smoking again AMA. Pain was rated 10/10 and the Beneficiary could barely walk due to pain. The Beneficiary visited his primary care physician on March 17, 2021, and was managed by Lehigh Valley Health Network nephrology for dialysis and renal failure. The Beneficiary was also managed for PVD but had not scheduled a follow up with Lehigh Valley Physician Group for re-evaluation of possible revascularization. Wound was reported as worsening, severe, continuous since onset, chronic; numbness, redness, drainage; and treatment helped a little. Assessment was ulcer of the right toe, and critical lower limb ischemia. The Beneficiary's severe pain was indicative of acute occlusion and critical limb ischemia. The Beneficiary was advised that additional treatment could not be offered in office setting to heal the Beneficiary's foot ulcer. The Beneficiary was referred immediately to the hospital Emergency Department for admission and a vascular evaluation. Follow up was to be scheduled as needed. *Id.* at 87-89.

B. Analysis

The issue is whether payment should be made under Medicare Part B for Skin Sub Graft Face/Nk/Hf/G (15275) and Affinity 1 Square Cm (Q4159) provided to Beneficiary #1 on February 9, 2021, February 23, 2021, March 9, 2021, and March 16, 2021. Based on the evidence presented, the decision is unfavorable.

The evidence shows that on February 3, 2021, the 55-year-old male Beneficiary presented to the Emergency Department 3.5 weeks status post partial amputation of the right foot. As reported on

February 3, 2021, the Beneficiary had an onset of osteomyelitis on January 28, 2021; an open wound of toe, onset November 5, 2020; neuropathy due to diabetes mellitus, onset November 5, 2020; and ulcer of the right toe, onset November 5, 2020. For Medicare coverage of a skin substitute graft for a lower extremity chronic wound, LCD L35041 requires the ulcer to be free of infection and free of the underlying osteomyelitis, with documentation indicating that the conditions that have been treated and resolved prior to institution of skin substitute therapy. Although the February 3, 2021, visit note mentions the Beneficiary's diagnosis of osteomyelitis, the subsequent visit notes do not include any reference to treatment for osteomyelitis, or whether it had resolved prior to the application of Affinity. Thus, the coverage criteria of LCD L35041 was not met.

## II. Beneficiary #2

**Claims**: 4824004660006, 4824004660011, 4824004660013, 4824004660015, 4824004660016 and 4824004660018
**Dates of Service:** February 9, 2021 to April 13, 2021
**ALJ Decision:** Partially Favorable

### A. Findings of Fact

1. On June 17, 2020, the 86-year-old female Beneficiary presented for follow up. Exh. 15, p. 58. The Beneficiary needed management of uncontrolled type 2 diabetes, requiring insulin. Past medical history included Charcot's foot due to diabetes mellitus, essential hypertension, mixed hyperlipidemia and cognitive impairment. The Beneficiary resided alone and due to significant cognitive impairment, frequently forgot to take insulin doses. The Beneficiary did report hypoglycemia awareness, frequently missed meals and experienced weight loss. Physical exam noted that extremities had no clubbing, cyanosis or edema. Assessment was diabetes mellitus type 2, due to underlying neurologic complication, essential hypertension, mixed hyperlipidemia and cognitive impairment. *Id.* at 58-59.

2. On January 7, 2021, the Beneficiary presented for evaluation of ulcers on the right ankle and foot, present for five weeks and developed after two falls in the home. Exh. 15, p. 3. Dementia was noted. X rays revealed no fracture or osteomyelitis. Prior treatment included cleansing ulcers with wound wash and applying Vitamin E&A ointment and Tegaderm. The Beneficiary was receiving wound care at Lehigh Valley Health Network with Calcium alginate AG and DSD. On January 6, 2021, a fall at home irritated the ulcers. Swelling in the right ankle after fall was reported. The Beneficiary's daughter reported the wounds were not healing despite wound care three times per week. Past medical history included arthritis; diabetes mellitus type 2; and foot deformity. Wound was ulcer on the right ankle, chronic, for five weeks duration. Physical exam vascular inspection noted full thickness ulcers at 5th met base. Assessment was nonpressure chronic ulcer of the right ankle with fat layer exposed; cellulitis of right lower limb. Plan was to treat cellulitis with Augmentin; continue home wound care with Aquacel and DSD. A course of oral antibiotics was recommended due to increased redness. Advanced wound healing product was recommended due to slow progression of healing with conservative treatment of Aquacel. Limited weight bearing was also recommended. The Beneficiary used a wheelchair and ambulated with the assistance of walker for balance. Follow up in one week was scheduled. *Id.* at 3-5.

3. On January 12, 2021, the Beneficiary presented for evaluation of ulcers on the right ankle and foot, present for six weeks. Exh. 15, p. 6. Due to the longevity of the ulcer and lack of response to traditional local wounds care, debridement was performed and Puraply XT to R ankle was performed. The wound was cleansed and patted dry. Using standard technique, Puraply XT was placed onto the wound bed, with care taken to preserve the orientation of the product and ensuring the chorion side was in contact with the wound bed. Non-adherent, non-occlusive primary dressing of Optifoam was applied and covered with secondary dry, sterile dressing, Kerlix and Coban. Product Wastage Documentation noted the amount used on the right ankle was 25 sq cm, with none discarded. Assessment was nonpressure chronic ulcer of the right ankle with fat layer exposed. Plan was to keep bandages dry and intact; continue pressure precautions; and non-weight bearing in the wheelchair and elevate foot using a walker for transfer in the bedroom and car. Follow up ion one week was scheduled. *Id.* at 6-8.

4. On January 19, 2021, the Beneficiary presented for evaluation of ulcers on the right ankle and foot, present for seven weeks. Exh. 15, p. 10. The wound was reported as improving, mild and chronic. Since the prior application of Puraply XT was successful with reducing size and increasing granulation tissue, Puraply XT was reapplied. The wound was debrided, cleansed, and Puraply XT was placed onto wound bed of the right ankle. Amount used was 25 sq cm, with none discarded. Assessment was nonpressure chronic ulcer of the right ankle with fat layer exposed. Plan was to keep bandages dry and intact and follow up in one week. *Id.* at 10-12.

5. On January 27, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for eight weeks. Exh. 15, p. 14. The Beneficiary had been elevating the leg while at home. The wound was reported as improving, mild and chronic. Since a prior application of Affinity was successful with reducing size and increasing granulation tissue, Affinity was reapplied. The wound was debrided, cleansed and patted dry. Amount used was 14 sq cm, with none discarded. Assessment was nonpressure chronic ulcer of the right ankle with fat layer exposed. Plan was to keep bandages dry and intact and follow up in one week. *Id.* at 14-17.

6. On February 9, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for nine weeks. Exh. 15, p. 18. The Beneficiary's dementia had increased, and the Beneficiary had been elevating the leg less. The wound was reported as improving, mild and chronic. Ulcers of the right foot were debrided. The wound was cleansed and patted dry. Since prior application of Affinity was successful in reducing size and increasing granulation tissue, Affinity was reapplied. Amount used was 21 sq cm, with none discarded. *Id.* at 18-20.

7. On February 16, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for ten weeks. Exh. 15, p. 22. The wound was reported as improving, mild and chronic. Excisional debridement of the wound was performed. Since the prior application of Affinity was successful in reducing size and increasing granulation tissue, Affinity was reapplied. Amount used was 21 sq cm, with none discarded. *Id.* at 22-24.

8. On February 23, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for eleven weeks. Exh. 15, p. 26. Ulcers of the right foot were debrided. It was recommended the Beneficiary resume at home wound care with

Amerigel and DSD due to a shortage of advanced healing products of Affinity and Puraply and inability for private office to receive them. It was noted the Beneficiary had increased noncompliance due to progression of dementia and removal of advanced wound care product was not feasible at that time to reapply. Due to the presence of cellulitis, an advanced wound healing product was not appropriate until the cellulitis was resolved. A culture was recommended if the cellulitis had not improved within one week. *Id.* at 26-28.

9. On March 2, 2021, the Beneficiary presented for follow up of cellulitis of the right ankle and re-evaluation of ulcers on the right ankle and foot, present for twelve weeks. Exh. 15, p. 30. At home wound care included Amerigel and DSD. Wound of the right ankle and foot was reported as not changing and chronic. Excisional debridement of the right foot wound was performed. Assessment was nonpressure chronic ulcer of the right heel and midfoot with fat layer exposed. Culture was taken of right ankle ulcer and Bactrim was started. The Beneficiary was to continue home wound care and follow up in one week. *Id.* at 30-32.

10. On March 9, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for thirteen weeks. Exh. 15, p. 30. Excisional debridement of the right foot ulcers was performed. Wound of the right ankle and foot reported as not changing and chronic. Assessment was nonpressure chronic ulcer of the right ankle with fat layer exposed. Plan was to continue home wound care, complete oral antibiotics and continue pressure precautions. The recent shortage of advanced wound products had resolved. If there was continued improvement in cellulitis, delayed healing would be resolved with an advanced wound product application at the next visit. *Id.* at 34-36.

11. On March 16, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for fourteen weeks. Exh. 15, p. 38. The Beneficiary had completed an oral course of Bactrim and improvement in cellulitis was noted. Excisional debridement of right foot ulcers was performed. Wound Product Application noted that since prior application of Affinity was successful, it was reapplied during this visit. Amount used was 28 sq cm, with none wasted. Assessment was nonpressure chronic ulcer of the right ankle with fat layer exposed. Plan was to discharge the Beneficiary to wound care with Amerigel and DSD; keep bandages dry and intact; and follow up in one week. *Id.* at 38-40.

12. On March 23, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for fifteen weeks. Exh. 15, p. 42. The wound was reported as improving, mild and chronic. Excisional debridement of the wound was performed. Affinity was reapplied to the wound, with 28 sq cm used and none wasted. Assessment was neuropathy due to diabetes mellitus II, and right ankle ulcer. Plan was to dispense diabetic shoes and inserts; keep bandages dry and intact; continue pressure precautions; and remain non-weight bearing in the wheelchair. The Beneficiary was advised to decrease shear forces and pressure, since both delayed wound healing. It was noted the Beneficiary slept on her side, was not elevating leg while sleeping; and was at increased risk for below the knee amputation on the right. The family reported that dementia contributed to deterioration and were unsure Beneficiary could be alone at night. Recommendation was to explore 24-hour homecare options and follow up in one week. *Id.* at 42-44.

13. On March 30, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for sixteen weeks. Exh. 15, p. 46. Wound was reported as improving. Excisional debridement of the right foot was performed. Affinity was reapplied to the wound, with 28 sq cm used and none wasted. Assessment was nonpressure chronic ulcer of the right heel and midfoot with fat layer exposed; and nonpressure chronic ulcer of the right ankle with fat layer exposed. Plan was to keep bandages dry and intact; and continue pressure precautions. It was noted that the vein of the right leg was cauterized with silver nitrate; abrasions were cleansed, and DSD was applied. The family advised the Beneficiary was becoming a harm to herself, due to progressing dementia and discussed 24-hour care. Follow up in one week was scheduled. *Id.* at 46-49.

14. On April 6, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for seventeen weeks. Exh. 15, p. 50. The wound was reported as improving. Excisional debridement of the right foot was performed. Wound Product Affinity was reapplied to the wound, with 28 sq cm used and none wasted. Assessment was nonpressure chronic ulcer of the right heel and midfoot with fat layer exposed; and nonpressure chronic ulcer of the right ankle with fat layer exposed. Plan was to keep bandages dry and intact; and continue pressure precautions. It was noted that despite visible blood and refill on the wound edges, an arterial duplex study was recommended to assess perfusion to the right lower extremity. It was noted that the lateral malleolus area of ankle was located in a physiological area of the body with an already deceased blood supply and thin tissue coverage in a healthy individual. The Beneficiary was again advised of adverse effects of increased pressure and uncontrolled blood glucose on wound healing. Follow up in one week was scheduled to check ulcers. *Id.* at 50-53.

15. On April 13, 2021, the Beneficiary presented for re-evaluation of ulcers on the right ankle and foot, present for eighteen weeks. Exh. 15, p. 54. Tenderness of the right leg, redness and swelling right ankle were noted. The wound was reported as improving. Excisional debridement of the right foot was performed. Wound Product Affinity was reapplied to the wound, with 28 sq cm used and none wasted. Assessment was deep venous thrombosis (DVT) of right lower extremity, acute; sudden onset of edema and pain in right lower calf; cellulitis of ankle; ankle ulcer; and ulcer of right foot. The Beneficiary was a poor historian and complained of right leg pain, which had begun three days earlier. A prescription was written for a STAT Duplex ultrasound for the right lower extremity to rule out DVT. A prescription was also written for Cipro. In addition to Affinity, hyperbaric treatment or wound vac was recommended over ankle ulcer for delayed healing of the ankle due to poor vascular supply of the lateral malleous. Plan was to keep bandages dry and intact; and continue pressure precautions. Evaluation at Lehigh Valley Health Network wound care center was also recommended for these additional treatments, as well as additional advanced wound care treatment not available in private office setting. The Beneficiary and daughter refused at that time. Follow up in one week was scheduled to check ulcers. *Id.* at 54-57.

B. <u>Analysis</u>

The issue is whether payment should be made under Medicare Part B for Skin Sub Graft Face/Nk/Hf/G (15275) and Affinity 1 Square Cm (Q4159) provided to Beneficiary #2 on February

9, 2021, March 16, 2021, March 23, 2021, March 30, 2021, April 6, 2021, and April 13, 2021. Based on the evidence presented, this Decision is partially favorable.

The evidence shows that the 87-year-old female Beneficiary was diagnosed with uncontrolled diabetes mellitus type 2 diabetes, with diabetic neuropathy and Charcot's foot. On January 7, 2021, nonpressure chronic ulcers on foot were first noted and it was reported the Beneficiary received wound care three times per week and conservative treatments with the application of Puraply XT, Optifoam, Kerlix, Amerigel and Coban. The Beneficiary was instructed to keep bandages dry and intact, and to continue home wound care and pressure precautions. Subsequent visit notes also reported the Beneficiary's wounds were debrided. On February 23, 2021, the Appellant noted the presence of cellulitis and stated that an advanced wound healing product was not appropriate until the cellulitis was resolved. The Appellant would obtain an ulcer culture if not improved in one week. On March 2, 2021, the Beneficiary presented for evaluation of cellulitis of the right ankle, which was debrided; and Bactrim was started. On March 9, 2021, the Beneficiary was to continue home wound care, complete oral antibiotics and continue pressure precautions. The Appellant noted the recent shortage of advanced wound products had resolved and if there was continued improvement in the Beneficiary's cellulitis, delayed healing would be resolved with an advanced wound product application at the next visit.

The evidence shows there was no statement cellulitis had resolved, or the results of the culture taken of the Beneficiary's right ankle ulcer. Subsequent visit notes on March 16, 2021, March 30, 2021, and April 6, 2021 reported that Affinity was applied to the Beneficiary's wound, but there was still no mention of the culture results or a further reference to cellulitis. On April 13, 2021, Beneficiary presented with tenderness, redness and swelling of the right leg and ankle and Affinity was applied to the wounds despite assessments of deep venous thrombosis of right lower extremity, acute; sudden onset of edema and pain in right lower calf; and cellulitis of ankle.

As reported on January 7, 2021, nonpressure chronic ulcers on the Beneficiary's foot were first noted and it was reported the Beneficiary received wound care three times per week and conservative treatments. Coverage is allowed for February 9, 2021 since cellulitis was first noted on February 23, 2021. Although cellulitis was noted on February 23, 2021, and culture of the ulcer was taken and antibiotics were started on March 2, 2021, the results of the culture were not mentioned at subsequent visits, and cellulitis was not mentioned again until April 13, 2021. Considering the chronology and documentation, it does not appear the Beneficiary's cellulitis had resolved throughout March and April 2021. Therefore, the coverage criteria of LCD L35041 was not met for dates of service after February 9, 2021. Medicare criteria were met for February 9, 2021, but denied for March 16, 2021, March 23, 2021, March 30, 2021, April 6, 2021, and April 13, 2021.

*Limitation on Liability Section 1879*

Because the denial is based on a ground specified in Section 1862(a)(1), the limitation on liability provision of Section 1879 must be considered. The Beneficiary is not liable as there is no Advance Beneficiary Notice or other evidence the Beneficiary knew, or reasonably could have known, that Medicare would not pay for the services. The Appellant, a supplier, is presumed to have knowledge of Medicare rules and procedures and presented no evidence to rebut this presumption. Therefore, the Appellant is not entitled to limitation on liability under Section 1879.

*Waiver of Overpayment Liability Section 1870*

Section 1870 of the Act provides that no adjustment or recovery of overpayments will be made if the individual receiving the incorrect payment is without fault. After three years, it is presumed, in the absence of evidence to the contrary, that the provider was without fault with respect to the overpayment. A provider is considered without fault, if it exercises reasonable care in billing and accepting payment. Based on the information available to the Appellant, including, Medicare instructions, and regulations, the Appellant did not have a reasonable basis for assuming the payment was correct.

**Conclusions of Law**

1) Medicare coverage criteria was not met under Part B for Skin Sub Graft Face/Nk/Hf/G (15275) and Affinity 1 Square Cm (Q4159) provided to Beneficiary #1 on February 9, 2021, February 23, 2021, March 9, 2021, and March 16, 2021.

2) Medicare coverage criteria was met under Part B for Skin Sub Graft Face/Nk/Hf/G (15275) and Affinity 1 Square Cm (Q4159) provided to Beneficiary #2 on February 9, 2021, but was not met for the items and services provided on March 16, 2021, March 23, 2021, March 30, 2021, April 6, 2021, and April 13, 2021.

3) Limitation of liability under Section 1879 of the Social Security Act applies to the Beneficiaries but not to the Appellant. The Beneficiaries did not know or could not reasonably be expected to have known that the services at issue would not be covered or payable by Medicare.

4) The Appellant, however, knew or reasonably should have known of Medicare rules, regulations, policies and procedures for providing and obtaining coverage/payment of the services at issue. The Appellant is responsible for the overpayments of the items and services and cannot bill the Beneficiaries.

**Order**

For the reasons discussed above, this Decision is PARTIALLY FAVORABLE. The Medicare Administrative Contractor is directed to process the claims in accordance with this Decision.

**SO ORDERED.**

Wendy A. Weber
U.S. Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

**REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL**

| | |
|---|---|
| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| | |
|---|---|
| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated____________________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| | | | | | |
|---|---|---|---|---|---|
| DATE | | | DATE | | |
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Irvine, CA**

| | |
|---|---|
| Appeal of: **THAT FOOT DOCTOR, LLC** | OMHA Appeal No.: **3-14706151359** |
| Beneficiary: **Multiple** | Medicare Part: **B** |
| Medicare No.: **Multiple** | Before: **Wendy Weber**<br>Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| **Exhibit Record** | **Administrative File Reference** | | | |
|---|---|---|---|---|
| | File Name | Page Range | | |
| Medical & Related: Medical Records | File 15 | 1 | : | 61 |
| Medical & Related: Medical Records | File 15 | 62 | : | 90 |
| Medical & Related: Medical Records/Medical Reports | File 5 | 364 | : | 394 |
| Guidance: Medical Literature | File 5 | 402 | : | 701 |
| Guidance: Medical Literature | File 5 | 703 | : | 712 |
| Position Statements: CMS contractor | File 16 | 1 | : | 3 |
| Procedural - CMS Levels: Reconsideration: 12/20/25 | File 2 | 1 | : | 48 |
| Procedural - CMS Levels: Remittance Advice: DOS: 2/23/21 | File 3 | 4 | : | 4 |
| Procedural - CMS Levels: Redetermination: DOS: 2/23/21 | File 3 | 5 | : | 15 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/09/21 | File 3 | 16 | : | 16 |
| Procedural - CMS Levels: Redetermination: DOS: 3/09/21 | File 3 | 17 | : | 27 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/16/21 | File 3 | 28 | : | 28 |
| Procedural - CMS Levels: Redetermination: DOS: 3/16/21 | File 3 | 29 | : | 39 |
| Procedural - CMS Levels: Remittance Advice: DOS: 2/09/21 | File 3 | 40 | : | 40 |
| Procedural - CMS Levels: Redetermination: DOS: 2/09/21 | File 3 | 41 | : | 51 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/16/21 | File 3 | 52 | : | 52 |
| Procedural - CMS Levels: Redetermination: DOS: 3/16/21 | File 3 | 53 | : | 63 |
| Procedural - CMS Levels: Remittance Advice: DOS: 2/09/21 | File 3 | 64 | : | 64 |
| Procedural - CMS Levels: Redetermination: DOS: 2/09/21 | File 3 | 65 | : | 75 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/23/21 | File 3 | 81 | : | 81 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/23/21 | File 3 | 81 | : | 81 |
| Procedural - CMS Levels: Redetermination: DOS: 3/23/21 | File 3 | 82 | : | 92 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/30/21 | File 3 | 93 | : | 93 |
| Procedural - CMS Levels: Redetermination: DOS: 3/30/21 | File 3 | 94 | : | 104 |
| Procedural - CMS Levels: Remittance Advice: DOS: 4/06/21 | File 3 | 105 | : | 105 |
| Procedural - CMS Levels: Redetermination: DOS: 4/06/21 | File 3 | 106 | : | 116 |
| Procedural - CMS Levels: Remittance Advice: DOS: 4/13/21 | File 3 | 117 | : | 117 |
| Procedural - CMS Levels: Redetermination: DOS: 4/13/21 | File 3 | 118 | : | 128 |
| Procedural - CMS Levels: Request for Redetermination | File 3 | 131 | : | 165 |
| Procedural - CMS Levels: Rep appointment | File 3 | 137 | : | 137 |

Index of the Administrative Record and Exhibit List

| | | | |
|---|---|---|---|
| Procedural - CMS Levels: Request for documentation | File 3 | 165 | : 406 |
| Procedural - CMS Levels: Request for Redetermination | File 4 | 1 | : 3 |
| Procedural - CMS Levels: Request for Reconsideration | File 5 | 1 | : 828 |
| Procedural - CMS Levels: DPM Review | File 5 | 396 | : 401 |
| Procedural - CMS Levels: Prior ALJ Decisions | File 5 | 713 | : 828 |
| Procedural - CMS Levels: QIC Acknowledgement Letter | File 6 | 1 | : 3 |
| Procedural - OMHA Level: Request for ALJ Hearing: 2/12/25 | File 1 | 1 | : 28 |
| Procedural - OMHA Level: Fax Confirm Sheet-NOH-Appellant (Rep): 2nd Copy of NOH Faxed 2/24/25 | File 10 | 1 | : 1 |
| Procedural - OMHA Level: NOH Appellant Mailing Packet: ECAPE Generated NOH Draft | File 11 | 1 | : 15 |
| Procedural - OMHA Level: Appellant's RNH: Rcvd. 2/26/25 | File 12 | 1 | : 4 |
| Procedural - OMHA Level: NOI-Cotiviti-Nonparty Written: Rcvd. 3/3/25 | File 13 | 1 | : 2 |
| Procedural - OMHA Level: Appellant's Brief and Exhibits: Rcvd. 3/27/25 | File 14 | 1 | : 1066 |
| Procedural - OMHA Level: Cotiviti's Position Paper: Rcvd. 4/2/25 | File 16 | 1 | : 3 |
| Procedural - OMHA Level: Appellant's Posthearing Docs: Rcvd. 4/10/25 | File 17 | 1 | : 7 |
| Procedural - OMHA Level: Notice of Hearing : 2/24/25 | File 7 | 1 | : 15 |
| Procedural - OMHA Level: E-Notice of Hearing : NOH to QIC | File 8 | 1 | : 1 |
| Procedural - OMHA Level: Fax Confirm Sheet-NOH-Appellant (Rep): NOH Faxed 2/24/25 | File 9 | 1 | : 1 |
| Proceeding (Audios): Hearing Audio | File 18 | 1 | : 1 |

| **Exhibit Records for beneficiary S. WANISH** | **Administrative File Reference** | | |
|---|---|---|---|
| | File Name | Page Range | |
| Medical & Related: Medical Records | File 15 | 1 | : 61 |
| Medical & Related: Medical Records/Medical Reports | File 5 | 364 | : 394 |
| Guidance: Medical Literature | File 5 | 402 | : 701 |
| Guidance: Medical Literature | File 5 | 703 | : 712 |
| Position Statements: CMS contractor | File 16 | 1 | : 3 |
| Procedural - CMS Levels: Reconsideration: 12/20/25 | File 2 | 1 | : 48 |
| Procedural - CMS Levels: Remittance Advice: DOS: 2/09/21 | File 3 | 40 | : 40 |
| Procedural - CMS Levels: Redetermination: DOS: 2/09/21 | File 3 | 41 | : 51 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/16/21 | File 3 | 52 | : 52 |
| Procedural - CMS Levels: Redetermination: DOS: 3/16/21 | File 3 | 53 | : 63 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/23/21 | File 3 | 81 | : 81 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/23/21 | File 3 | 81 | : 81 |
| Procedural - CMS Levels: Redetermination: DOS: 3/23/21 | File 3 | 82 | : 92 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/30/21 | File 3 | 93 | : 93 |
| Procedural - CMS Levels: Redetermination: DOS: 3/30/21 | File 3 | 94 | : 104 |
| Procedural - CMS Levels: Remittance Advice: DOS: 4/06/21 | File 3 | 105 | : 105 |
| Procedural - CMS Levels: Redetermination: DOS: 4/06/21 | File 3 | 106 | : 116 |

Index of the Administrative Record and Exhibit List

| | | | |
|---|---|---|---|
| Procedural - CMS Levels: Redetermination: DOS: 4/13/21 | File 3 | 118 | : 128 |
| Procedural - CMS Levels: Request for Redetermination | File 3 | 131 | : 165 |
| Procedural - CMS Levels: Rep appointment | File 3 | 137 | : 137 |
| Procedural - CMS Levels: Overpayment Demand Letter | File 3 | 145 | : 164 |
| Procedural - CMS Levels: Request for documentation | File 3 | 165 | : 406 |
| Procedural - CMS Levels: Request for Redetermination | File 4 | 1 | : 3 |
| Procedural - CMS Levels: Request for Reconsideration | File 5 | 1 | : 828 |
| Procedural - CMS Levels: DPM Review | File 5 | 396 | : 401 |
| Procedural - CMS Levels: Prior ALJ Decisions | File 5 | 713 | : 828 |
| Procedural - CMS Levels: QIC Acknowledgement Letter | File 6 | 1 | : 3 |
| Procedural - OMHA Level: Request for ALJ Hearing: 2/12/25 | File 1 | 1 | : 28 |
| Procedural - OMHA Level: Fax Confirm Sheet-NOH-Appellant (Rep): 2nd Copy of NOH Faxed 2/24/25 | File 10 | 1 | : 1 |
| Procedural - OMHA Level: NOH Appellant Mailing Packet: ECAPE Generated NOH Draft | File 11 | 1 | : 15 |
| Procedural - OMHA Level: Appellant's RNH: Rcvd. 2/26/25 | File 12 | 1 | : 4 |
| Procedural - OMHA Level: NOI-Cotiviti-Nonparty Written: Rcvd. 3/3/25 | File 13 | 1 | : 2 |
| Procedural - OMHA Level: Appellant's Brief and Exhibits: Rcvd. 3/27/25 | File 14 | 1 | : 1066 |
| Procedural - OMHA Level: Cotiviti's Position Paper: Rcvd. 4/2/25 | File 16 | 1 | : 3 |
| Procedural - OMHA Level: Appellant's Posthearing Docs: Rcvd. 4/10/25 | File 17 | 1 | : 7 |
| Procedural - OMHA Level: Notice of Hearing : 2/24/25 | File 7 | 1 | : 15 |
| Procedural - OMHA Level: E-Notice of Hearing : NOH to QIC | File 8 | 1 | : 1 |
| Procedural - OMHA Level: Fax Confirm Sheet-NOH-Appellant (Rep): NOH Faxed 2/24/25 | File 9 | 1 | : 1 |
| Proceeding (Audios): Hearing Audio | File 18 | 1 | : 1 |

To protect beneficiary privacy, names and references to other individuals have been removed from the beneficiary copies of the Administrative Record and Exhibit List.

Index of the Administrative Record and Exhibit List

| Exhibit Records for beneficiary W. KITCHERMAN | Administrative File Reference | | |
|---|---|---|---|
| | File Name | Page Range | |
| Medical & Related: Medical Records | File 15 | 62 | : 90 |
| Medical & Related: Medical Records/Medical Reports | File 5 | 364 | : 394 |
| Guidance: Medical Literature | File 5 | 402 | : 701 |
| Guidance: Medical Literature | File 5 | 703 | : 712 |
| Position Statements: CMS contractor | File 16 | 1 | : 3 |
| Procedural - CMS Levels: Reconsideration: 12/20/25 | File 2 | 1 | : 48 |
| Procedural - CMS Levels: Remittance Advice: DOS: 2/23/21 | File 3 | 4 | : 4 |
| Procedural - CMS Levels: Redetermination: DOS: 2/23/21 | File 3 | 5 | : 15 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/09/21 | File 3 | 16 | : 16 |
| Procedural - CMS Levels: Redetermination: DOS: 3/09/21 | File 3 | 17 | : 27 |
| Procedural - CMS Levels: Remittance Advice: DOS: 3/16/21 | File 3 | 28 | : 28 |
| Procedural - CMS Levels: Redetermination: DOS: 3/16/21 | File 3 | 29 | : 39 |
| Procedural - CMS Levels: Remittance Advice: DOS: 2/09/21 | File 3 | 64 | : 64 |
| Procedural - CMS Levels: Redetermination: DOS: 2/09/21 | File 3 | 65 | : 75 |
| Procedural - CMS Levels: Request for Redetermination | File 3 | 131 | : 165 |
| Procedural - CMS Levels: Rep appointment | File 3 | 137 | : 137 |
| Procedural - CMS Levels: Overpayment Demand Letter | File 3 | 145 | : 164 |
| Procedural - CMS Levels: Request for documentation | File 3 | 165 | : 406 |
| Procedural - CMS Levels: Request for Redetermination | File 4 | 1 | : 3 |
| Procedural - CMS Levels: Request for Reconsideration | File 5 | 1 | : 828 |
| Procedural - CMS Levels: DPM Review | File 5 | 396 | : 401 |
| Procedural - CMS Levels: Prior ALJ Decisions | File 5 | 713 | : 828 |
| Procedural - CMS Levels: QIC Acknowledgement Letter | File 6 | 1 | : 3 |
| Procedural - OMHA Level: Request for ALJ Hearing: 2/12/25 | File 1 | 1 | : 28 |
| Procedural - OMHA Level: Fax Confirm Sheet-NOH-Appellant (Rep): 2nd Copy of NOH Faxed 2/24/25 | File 10 | 1 | : 1 |
| Procedural - OMHA Level: NOH Appellant Mailing Packet: ECAPE Generated NOH Draft | File 11 | 1 | : 15 |
| Procedural - OMHA Level: Appellant's RNH: Rcvd. 2/26/25 | File 12 | 1 | : 4 |
| Procedural - OMHA Level: NOI-Cotiviti-Nonparty Written: Rcvd. 3/3/25 | File 13 | 1 | : 2 |
| Procedural - OMHA Level: Appellant's Brief and Exhibits: Rcvd. 3/27/25 | File 14 | 1 | : 1066 |
| Procedural - OMHA Level: Cotiviti's Position Paper: Rcvd. 4/2/25 | File 16 | 1 | : 3 |
| Procedural - OMHA Level: Appellant's Posthearing Docs: Rcvd. 4/10/25 | File 17 | 1 | : 7 |
| Procedural - OMHA Level: Notice of Hearing : 2/24/25 | File 7 | 1 | : 15 |
| Procedural - OMHA Level: E-Notice of Hearing : NOH to QIC | File 8 | 1 | : 1 |
| Procedural - OMHA Level: Fax Confirm Sheet-NOH-Appellant (Rep): NOH Faxed 2/24/25 | File 9 | 1 | : 1 |
| Proceeding (Audios): Hearing Audio | File 18 | 1 | : 1 |

To protect beneficiary privacy, names and references to other individuals have been removed from the

OMHA Appeal No.: «appealNum»

## ATTACHMENT A

| Bene. No. | Beneficiary Name | Medicare No. | Code | Date of Service | Disposition |
|---|---|---|---|---|---|
| 1 | W.K. | *****7ND05 | 15275 | 2/09/21 | Unfavorable |
| | | | Q4159 | 2/09/21 | Unfavorable |
| | | | 15275 | 2/23/21 | Unfavorable |
| | | | Q4159 | 2/23/21 | Unfavorable |
| | | | 15275 | 3/09/21 | Unfavorable |
| | | | Q4159 | 3/09/21 | Unfavorable |
| | | | 15275 | 3/16/21 | Unfavorable |
| | | | Q4159 | 3/16/21 | Unfavorable |
| | | | | | |
| 2 | S.W. | *****9XR72 | 15275 | 2/09/21 | Favorable |
| | | | Q4159 | 2/09/21 | Favorable |
| | | | 15275 | 2/23/21 | Unfavorable |
| | | | Q4159 | 2/23/21 | Unfavorable |
| | | | 15275 | 3/09/21 | Unfavorable |
| | | | Q4159 | 3/09/21 | Unfavorable |
| | | | 15275 | 3/16/21 | Unfavorable |
| | | | Q4159 | 3/16/21 | Unfavorable |
| | | | 15275 | 3/23/21 | Unfavorable |
| | | | Q4159 | 3/23/21 | Unfavorable |
| | | | 15275 | 3/30/21 | Unfavorable |
| | | | Q4159 | 3/30/21 | Unfavorable |
| | | | 15275 | 4/6/21 | Unfavorable |
| | | | Q4159 | 4/6/21 | Unfavorable |
| | | | 15275 | 4/13/21 | Unfavorable |
| | | | Q4159 | 4/13/21 | Unfavorable |

REC'D
MAY 27 2025
PARSONS BEHLE & LATIMER

# EXHIBIT “B”

**DEPARTMENT OF HEALTH & HUMAN SERVICES** Office of the Secretary

Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC 20201
(202)565-0100/Toll Free:1-866-365-8204

Docket Number: M-25-3364
OMHA Appeal Number: 3-14706151359

Parsons, Behle, and Latimer
Attn: J. Kevin WEst
800 West Main Street, Suite 1300
Boise, ID 93702

NOTICE AND ORDER OF MEDICARE APPEALS COUNCIL

What This Notice Means

Enclosed is an order of the Medicare Appeals Council.

This notice and enclosed order were mailed on August 20, 2026.

Enclosure

cc: That Foot Doctor, LLC
Beneficiaries
Q2A AdQIC Records Management

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
**Medicare Appeals Council**
**Docket No. M-25-3364**

That Foot Doctor, LLC Appellant
OMHA Appeal No. 3-14706151359

The Medicare Appeals Council (Council) received your request to escalate the above appeal to Federal district court dated August 6, 2026.[1] The Council grants your request for escalation.

The 90-day time frame for the Council to issue a decision, dismissal, or remand order has expired. *See* 42 C.F.R. § 405.1100(c). Due to the large number of pending appeals, the Council is unable to issue a decision, dismissal, or remand order within five calendar days of your request to escalate to Federal district court. 42 C.F.R. § 405.1132(a)(1). Under these circumstances, the regulations permit you to bypass Council review and seek review of the Administrative Law Judge's (ALJ's) decision in Federal district court. 42 C.F.R. § 405.1132(a)(2).

In order to escalate, you must file an action in Federal district court within 60 calendar days after you receive this notice and the amount in controversy must be $1,960 or more. 42 C.F.R. §§ 405.1132(b), 405.1136(a)(1); see also 90 Fed. Reg. 55869 (Dec. 4, 2025). If you cannot file your complaint within 60 days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134. If you do not file an action in Federal district court, then your appeals will remain before the Council. 42 C.F.R. § 405.1136(a)(2).

[Continued on next page]

[1] A list with the beneficiaries' initials, the last four digits of the Health Insurance Claim Number (HICN), and the dates of service at issue is attached to this action. *See* Attachment A.

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council docket numbers and ALJ appeal numbers that you are appealing. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201. In addition, you must serve the United States Attorney for the district in which you file your complaint and the Attorney General of the United States. See rules 4(c) and (i) of the Federal Rules of Civil Procedure and 45 C.F.R. § 4.1.

**MEDICARE APPEALS COUNCIL**

Cristina Prelle
Administrative Appeals Judge

Date: August 20, 2026

**ATTACHMENT A**
**Beneficiary List**
**Council Docket Number: M-25-3364**
**Appellant: That Foot Doctor, LLC**
**OMHA Appeal Number: 3-14706151359**

| Beneficiary | HCIN | Date(s) of Service |
|---|---|---|
| W.K. | ND05 | 02/09/21 – 03/16/21 |
| S.W. | XR72 | 03/16/21 – 04/13/21 |

**DEPARTMENT OF HEALTH & HUMAN SERVICES** Office of the Secretary

Departmental Appeals Board
Room G-644, MS 6127
330 Independence Avenue S.W.
Washington, DC 20201

# Nondiscrimination Notice

The Departmental Appeals Board (DAB) complies with applicable Federal civil rights laws and does not discriminate based on race, color, national origin, age, disability, or sex. The DAB does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex.

The DAB provides free aids and services to people with disabilities to communicate effectively with us, such as:

- Qualified sign language interpreters
- Written information in other formats (large print, audio, accessible electronic formats, other formats)

The DAB also provides free language services to people whose primary language is not English, such as:

- Qualified interpreters
- Information written in other languages

If you need these services, contact the DAB Administration Division at (202) 565-0200 or DABAdministrationDivision@hhs.gov.

If you believe the DAB has failed to provide these services or discriminated in another way on the basis of race, color, national origin, age, disability, or sex, you can file a grievance with the U.S. Department of Health and Human Services, Office for Civil Rights, electronically through the Office for Civil Rights Complaint Portal (https://ocrportal.hhs.gov/ocr/portal/lobby.jsf), or by mail or phone at:

U.S. Department of Health and Human Services
200 Independence Avenue, SW
Room 509F, HHH Building
Washington, D.C. 20201
1-800-368-1019, 800-537-7697 (TDD)

Complaint forms are available at http://www.hhs.gov/ocr/office/file/index.html.

## DAB Language Access Services:

**Español (Spanish)**
ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-202-565-0200.

**繁體中文 (Chinese)**
注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-202-565-0200。

**Tiếng Việt (Vietnamese)**
CHÚ Ý: Nếu bạn nói Tiếng Việt, có các dịch vụ hỗ trợ ngôn ngữ miễn phí dành cho bạn. Gọi số 1-202-565-0200.

**한국어 (Korean)**
주의: 한국어를 사용하시는 경우, 언어 지원 서비스를 무료로 이용하실 수 있습니다. 1-202-565-0200 번으로 전화해 주십시오.

**Tagalog (Tagalog – Filipino)**
PAUNAWA: Kung nagsasalita ka ng Tagalog, maaari kang gumamit ng mga serbisyo ng tulong sa wika nang walang bayad. Tumawag sa 1-202-565-0200.

**Русский (Russian)**
ВНИМАНИЕ: Если вы говорите на русском языке, то вам доступны бесплатные услуги перевода. Звоните 1-202-565-0200.

**العربية (Arabic)**
ملحوظة: إذا كنت تتحدث اذكر اللغة، فإن خدمات المساعدة اللغوية تتوافر لك بالمجان. اتصل برقم 1-202-565-0200 (رقم هاتف الصم والبكم:

**Kreyòl Ayisyen (French Creole)**
ATANSYON: Si w pale Kreyòl Ayisyen, gen sèvis èd pou lang ki disponib gratis pou ou. Rele 1-202-565-0200.

**Français (French)**
ATTENTION : Si vous parlez français, des services d'aide linguistique vous sont proposés gratuitement. Appelez le 1-202-565-0200.

**Polski (Polish)**
UWAGA: Jeżeli mówisz po polsku, możesz skorzystać z bezpłatnej pomocy językowej. Zadzwoń pod numer 1-202-565-0200.

**Português (Portuguese)**
ATENÇÃO: Se fala português, encontram-se disponíveis serviços linguísticos, grátis. Ligue para 1-202-565-0200.

**Italiano (Italian)**
ATTENZIONE: In caso la lingua parlata sia l'italiano, sono disponibili servizi di assistenza linguistica gratuiti. Chiamare il numero 1-202-565-0200.

**Deutsch (German)**
ACHTUNG: Wenn Sie Deutsch sprechen, stehen Ihnen kostenlos sprachliche Hilfsdienstleistungen zur Verfügung. Rufnummer: 1-202-565-0200.

**日本語 (Japanese)**
注意事項：日本語を話される場合、無料の言語支援をご利用いただけます。1-202-565-0200 まで、お電話にてご連絡ください。

**فارسی (Farsi)**
**توجه:** اگر به زبان فارسی گفتگو می کنید، تسهیلات زبانی بصورت رایگان برای شما فراهم می باشد. با 1-202-565-0200 تماس بگیرید.